## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

**JUSTIN SPIEHS**

          Plaintiff

v.

**THE CITY OF MERRIAM KANSAS**
**\***
**ANNA SLOCUM** in her individual capacity
**\***
**AARON SIMMONS,** in his individual capacity
**\***
**DEVIN ALLEN,** in his individual capacity
**\***
**JOHN KISTHARDT,** in his individual capacity
          Defendants

Case No.  2:25-cv-2111

Request for Jury Trial

### COMPLAINT

COMES NOW the plaintiff Justin Spiehs, by and through counsel Linus L. Baker, and for his Complaint against each defendant, hereby states as follows.

The Complaint begins and ends at each of the defendants failure to recognize the difference between private and public property. In this lawsuit, the defendants viewed the publicly owned Merriam Community Center literally as a "private business" in which it could demand, for any reason, that an individual be told to leave. Of all entities in the Universe, the ACLU did not like the message Dr. Justin Spiehs presented at an ACLU Town Hall meeting so much that it urged the Parks and Recreation Director Anna Slocum to eject Dr. Spiehs from the hallway of the Center even though Dr. Spiehs was simply reporting on the event, filming, and possessing a message the ACLU disapproved of. Director Slocum took the ACLU up on its demand and had Dr. Spiehs arrested and removed from the Community Center on February 17, 2025.

### JURISDICTION AND VENUE

1. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

1

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

**THE PARTIES**

4. Plaintiff Justin Spiehs is a natural person, citizen of Kansas, and legal resident of Johnson County, Kansas. Dr. Spiehs has a doctorate degree in Lifespan Human Development and a Master's degree in Marriage and Family Therapy.

5. Dr. Spiehs is a citizen journalist and reports for and utilizes The Dreaded Rabble Rouser YouTube channel to publish news of public concern.  A citizen-journalist is like an unpaid freelancer who uses digital media to report on newsworthy events. News-gathering protections of the First Amendment do not turn on professional credentials or status.

6. At all relevant times, Defendant The City of Merriam (City) is and was a municipal corporation that operates the Merriam Community Center and its Police Department for The City of Merriam.  The City Council is the final policy maker for the City with regard to Merriam Community Center and Police policies and practices. The City Council has delegated to the Chief of Police the authority and responsibility for the day-to-day operations of the Police Department. The City of Merriam has the power to sue and be sued and to exercise such other and further powers as may be conferred by the constitution or statutes of the State of Kansas.

7. Anna Slocum is employed as the Parks and Recreation Director for the City of Merriam, Kansas. The City Council has delegated to the defendant Slocum the authority and responsibility for the day-to-day operations of the Merriam Community Center.  Defendant Slocum is sued in her individual capacity and was present and participated with the other defendants in the arrest and removal of the plaintiff from the Merriam Community Center on February 17, 2025.  Defendant Slocum was acting in the course and scope of her employment with the City of Merriam on that date.

8. Aaron Simmons is employed by the City of Merriam, Kansas, as a law enforcement officer. Defendant Simmons is sued in his individual capacity. Defendant Simmons as acting in the course and scope of his employment with the City of Merriam on that date.

9. Devin Allen is employed by the City of Merriam, Kansas, as a law enforcement officer. Defendant Allen is sued in his individual capacity. Defendant Allen was acting in the course and scope of his employment with the City of Merriam on that date.

10. John Kisthardt is employed by the City of Merriam, Kansas, as a law enforcement officer. Defendant Kisthardt is sued in his individual capacity. Defendant Kisthardt was acting in the course and scope of his employment with the City of Merriam on that date.

**STATEMENT OF FACTS**

11. The City of Merriam, Kansas, owns and operates a public building located at 6040 Slater St., Merriam, Kansas 662021.

12. The name of that building is the Merriam Community Center ("Center" or "Community Center").

13. The Center is open to the public from 5 a.m. to 9 p.m. Monday through Friday with more limited hours on the weekend.

14. The entryway and hallways of the Center is a designated public forum.   Regulations on speech in public and designated public forums require more exacting legal scrutiny.

15. Dr. Spiehs had a First Amendment right to access the Center on February 17, 2025, which is a designated public forum. *See Doe v. City of Albuquerque,* 667 F.3d 1111, 1129 (10th Cir. 2012) (public library is a designated, rather than a limited, public forum).

16. According to its website https://www.merriam.org/Government/Departments/Parks-Rec  it states that "Merriam Parks and Recreation provides classes and workshops, promotes fitness and wellness, and creates lifetime memories for kids playing in the pools at Merriam Community Center."

17. The website displays photos of the Center hallway and front of the building such as depicted below:





18. The Parks and Recreation Department hosts monthly exhibits in areas of the Community Center called the Tim Murphy Art Gallery.

19. The Department also hosts public events at the Center including one called "Free Day at the MCC" in which Merriam residents are invited to the Center including its indoor pool and its fitness center.

20. The Center also provides for rentals of rooms for a "baby shower, birthday party, wedding reception or business meeting."

21. The Center's art gallery displays is in the in the hallway adjoining the Campbell, Kessler, and Loomer rooms of the Center.

22. On its website it shows its available meeting room rental rates as shown below:

| Room | Resident | Non-Resident | Commercial |
|---|---|---|---|
| Campbell, Kessler, or Loomis | $35 | $45 | $55 |
| Campbell/Kessler or Kessler/Loomis | $60 | $75 | $90 |
| Founders | $95 | $120 | $145 |
| Esther Brown | $30 | $35 | $45 |
| Walker School Room - Conference Room | $25 | $30 | $40 |
| After-hours staff charges | $20/hour/staff | $20/hour/staff | $20/hour/staff |

23. On its website the Center shows the meeting room capacity as shown below:

| Room | Banquet | Classroom | Theater |
|---|---|---|---|
| Campbell, Kessler, Loomis | 56 | 48 | 70 |
| Campbell/Kessler or Kessler/Loomis | 144 | 80 | 112 |
| Founders | 224 | 120 | 224 |
| Esther Brown | N/A | 30 | 40 |
| Walker School Room - Conference Room | 12 | N/A | N/A |

24. The Center offers room rentals that can be combined for meetings as depicted below from the Center's website:



Use one, two, or all three meeting rooms

25. The American Civil Liberties Union and the ACLU of Kansas announced it would "host a town hall this Presidents' Day alongside Planned Parenthood of the Great Plains, Kansas

National Education Association, and Advocates for Immigrants' Rights and Reconciliation" in which Dr. Spiehs contacted and made an RSVP reservation.

26. The ACLU contracted or otherwise reached an agreement with the Center to use or rent certain rooms for its town hall meeting on February 14, 2025.

27. Leslie Butsch, 10561 W. Barkley Pl St 500, Overland Park KS paid the Center on 2/14/2025, for the three adjoining room rentals (Campbell/Kessler/Loomis)  While the ACLU could use the hallway to enter into its rented rooms, the ACLU did not rent the entire Center building or the Center hallway (which is also the Tim Murphy Art Gallery) adjacent to the rooms in which to conduct its town hall meeting.

28. The ACLU announced on February 13, 2025, that it had moved the location to the Center as depicted below:



**MONDAY: ACLU MOBILIZES KANSANS ON PRESIDENT'S DAY TO DEFY EXTREMIST POWER GRAB**

FEBRUARY 13, 2025

  

**\*\*\*MEDIA ADVISORY for Monday, February 17 at 4 pm\*\*\***

**ACLU Mobilizes Kansans on President's Day to Defy Extremist Power Grab**

CONTACT: Esmie Tseng, ACLU of Kansas, etseng@aclukansas.org

**WHAT:**
With new civil liberties abuses coming to light daily and the Trump administration's hubris showing no signs of abating, the American Civil Liberties Union and the ACLU of Kansas will host a town hall this Presidents' Day alongside Planned Parenthood of the Great Plains, Kansas National Education Association, and Advocates for Immigrants' Rights and Reconciliation to educate, mobilize, and apply direct pressure on federal and state representatives.

The town hall will highlight the Trump administration's attempts to abuse executive power to harm our communities, our civil liberties, and the constitution and the similarly blatant power grabs on the state level in Kansas. Speakers will also provide concrete actions on how to fight back at the local, state, and federal level.

**WHEN:**
Monday, February 17, 4 p.m.

**WHERE:**

Merriam Community Center: Campbell/Kessler Room
6040 Slater St, Merriam, KS 66202

*Please note this is a new location from previously listed.*



**PROTECT PEOPLE, NOT POWER**
ACLU

**STAY INFORMED**

Email address

Zip code

GET EMAIL ALERTS

29. The Center rented to the ACLU the Campbell/Kessler/Loomer rooms for that February 17th event.

30. Dr. Spiehs arrived at the Center on February 17, 2025 calm as a cucumber as he has participated in public meetings in different venues many times in the past.

31. Dr. Spiehs recorded his entry and the events that took place involving himself at the Center that evening using his phone.

32. Dr. Spiehs displayed two written messages that night: one said "Liberals love 'big balls'" and "Abortion is child murder clear as day."

33. Dr. Spiehs entered the Center that evening without being required to identify himself or pay to do so. There were numerous individuals entering the Center during the time Dr. Spiehs did in which they also did not identify themselves or pay to enter as depicted below:



34. Dr. Spiehs quietly entered the Center and made his way through the public building which is a public forum to Campbell/Kessler/Loomer rooms.

35. In the hallway the two women ahead of him were allowed to pass and walked into the meeting rooms as depicted below:



36. When as Dr. Spiehs followed he was told by the woman below that "we are about to reach capacity."



37. Dr. Spiehs continued to follow the women and reached the meeting room entry doors which were open and the meeting had begun as depicted below:



38. From behind Dr. Spiehs a woman approached and told him the meeting rooms were at capacity as depicted below:



39. The woman then walked past Dr. Spiehs and closed the door as depicted below:



40. The first woman then confronted Dr. Spiehs telling him the meeting was at capacity while at the same time allowing a woman to pass by and enter into the meeting as depicted below:



41. Dr. Spiehs asked about his RSVP and then remained quietly in the hallway for several minutes filming the hallway and individuals.  Dr. Spiehs noticed other individuals at a different doorway into the meeting in which he saw four or five individuals allowed to enter as depicted below:



42. A bearded man who had been stationed at the other door then walked down to this entrance and Dr. Spiehs asked "why did they get to go in?" to which the man said "hmm, I don't know."

43. When Dr. Spiehs asked the bearded man (who was the Kansas ACLU communications and media manager) about blocking the door, the woman with the stocking cap that had "ACLU" on it appeared and said "you're also not allowed to protest in here."



44. While they were speaking a woman existed from that door and Dr. Spiehs in a quiet low tone asked to enter seeing that the room must have been one under capacity. Neither would allow Dr. Spiehs to enter.

45. The woman then called out to "Evan," an ACLU employee or volunteer, and said "can you get the officers to come down here?" Dr. Spiehs asked "what are you getting the officers for?" "Have I done something wrong?" No response was provided.

46. Three officers stood in near proximity to Dr. Spiehs in which Dr. Spiehs remained calm, cool, and collected speaking so softly that at time the officers asked him to repeat what Dr. Spiehs had said. The defendant officer Allen said they were waiting on a supervisor. Approximately 24 minutes had transpired from the time Dr. Spiehs started filming to this point in time.

47. The defendant officers then appeared as depicted below while saying nothing until Dr. Spiehs asked for their names and badge numbers which were the defendants Allen and Kristhardt depicted below:



48. Dr. Spiehs walked further down the hallway and turned around to view where he had been with the officers and the bearded man as depicted below:



49. When Dr. Spiehs walked further down the hallway to a different set of doors two women were stationed there while that door was open as depicted below:



50. The woman told Dr. Spiehs the door was open so that there could be "egress" in the event of a fire. Dr. Spiehs continued to remain in low key demure, calm, and serenely quiet to himself in filming the hallway and the entry into the rooms.

51. During this time the "supervisor" the officer referred to was speaking with defendant Slocum. Defendant Slocum's dialogue with defendant Simmons was recorded on the Axon video and is set forth below (at 16:25 Simmons approaches Anna Slocum at the front entry way of the community center and the following conversation takes place, captured on Simmons' Axon body worn camera);

| Simmons (A.S.) | Can I talk with you please? |
|---|---|
| Slocum | Yes. Huh uh. |
| A.S. | Hi |
| Slocum | Hi. He's [Dr. Spiehs] gone into the room outside of capacity. |
| A.S. | Ok. So, he's either trespassed or not. |
| Slocum | I'll trespass him. |
| A.S. | Ok. |
| Slocum | Because I can't have him, I can't have him in this building. I told other people 'We're at capacity, you have to leave. |
| A.S. | Ok. |
| Slocum | You're not part of this group, so |
| A.S. | And that's fine. Where is the um… |
| Slocum | The protest zone is out by the library |
| A.S. | Ok. Do you have it clearly marked by chance? |
| Slocum | It's not clearly marked but I can look it up on the map |
| A.S. | Can you look it up real quick for me, please? |
| Slocum | Mmhmm |
| A.S. | I just want to be able to give him a final option. |
| Slocum | I understand |
| A.S. | And I am recording, by the way. |
| Slocum | Ok perfect, thank you. Let's look on our map that we have from the library, a library spot. |
| A.S. | Oh man. |
| Slocum | It's pretty cold out there isn't it? |
| A.S. | It is pretty cold. Do you know what this, like… |
| Slocum | It's ACLU. |
| A.S. | Do we know what their topic of discussion is? |
| Slocum | Yes, it's protect people not power, freedom from executive overreach. |
| A.S. | Ok. |
| Slocum | So the event has been full um because we found, I found out today that it was happening here |
| A.S. | Mmhmm |
| Slocum | And now it's saying it's from 4 to 5 and you can RSVP here but earlier today you couldn't RSVP. It was full. |
| A.S. | Ok. Have we and we have spoken with the facilitators of this? |
| Slocum | I told the facilitators what our cap was. |
| A.S. | Uh huh |
| Slocum | I said you have to fill every chair and we have 60 people and then we're at capacity. And so we started counting when we got, we had 40 people standing so we started counting and then we started and they were like we're full like at some point we're at fire code. |

| | |
|---|---|
| A.S. | Right. |
| Slocum | I thought that was it. |
| A.S. | Has anybody told him that he needs to leave the building? |
| Slocum | The group that's organizing has told him he needs to leave because they are at capacity. |
| A.S. | Ok. Has anybody from our building? |
| Slocum | We have not officially said anything because it's their event. |
| A.S. | But you're willing to trespass him from the building? |
| Slocum | I mean I can tell him he needs to leave. I'm trying to find the… |
| A.S. | I can tell him as a representative of you, I've spoken with you so. |
| Slocum | Yes. That's fine I'm trying to find their [the library] protest spot. I think it's out by the parking structure but now I can't find a, I can't find a picture. Cause they have to have a designated, um [calls out to a colleague in the next door office] Hey Smo |
| David Smothers | Yeah? |
| Slocum | Do you remember where the designated protest spot is at? |
| Smothers | Smothers [exiting his office]: Hey, how's it going? [to A.S.] |
| A.S. | A.S. [responding to Smothers] Hey buddy. |
| Smothers | [to Slocum] What's that? |
| Slocum | [to Smothers] Do you remember where the designated protest spot is at? |
| Smothers | I do not. We can set that, though. |
| Slocum | I'm just trying to get, he's obviously… |
| Smothers | Like if you have an event and you have spec., you can have a designated spot. |
| A.S. | Yeah. |
| Smothers | Like at the festival it's right in front right inside the entrance to the side. |
| A.S. | Right. I just want to see, I want to be able to give him… |
| Smothers | Do you think we'll have protestors today? |
| A.S. | Well, we have one and he is, I want to be able to give him the option to go to a protesting spot before we arrest him for trespassing. |
| Slocum | And I'm trying to find their site plan [the library] |
| Smothers | I mean it would probably be, because you know because they want to be seen |
| A.S. | Yeah. |
| Smothers | They want to be heard but I think we can, so that they don't interfere with a flow of traffic, I would just say this front lawn [looking and pointing out the window] |
| A.S. | Or the sidewalk? |
| Smothers | Or the sidewalk. Yeah or any…yeah. |
| A.S. | Ok. I just didn't know if there was a preset one already in place. |
| Slocum | There is for the library. |
| Smothers | I don't think we have one, though. |
| Slocum | We don't but the library does and with the library being on our… |
| A.S. | Is that just a preplanned for all events kind of thing? |
| Slocum | It's for them, yeah, it's their designated location. |
| A.S. | Ok. |
| Slocum | But I'm not finding, I just know they have it. |
| A.S. | So for now do you a problem with me setting some or, setting some, telling him that the sidewalk is okay? |
| Slocum | No, I do not. |

12

| | |
|---|---|
| | Sidewalk is okay. |
| A.S. | Alright, thank you. [A.S. leaves the office to walk out of the private area] I may need you to sign something, Anna. |
| Slocum | Ok, I'll come back out. |
| A.S. | Ok. |
| Slocum | Yes, sir? [conversation after Dr. Spiehs arrested] |
| A.S. | Do you want the female that was with him to leave too? |
| Slocum | If, I mean, is she, people are waiting for friends because they got in and they did not but… |
| A.S. | Yeah, I mean… |
| Slocum | Anybody that's with this event isn't leaving because of… |
| A.S. | The overcapacity. |
| Slocum | The overcapacity. |
| A.S. | Needs to go? |
| Slocum | Needs to go, yes. |
| A.S. | Ok. Alright. |
| Slocum | Because we are… |
| A.S. | I mean I don't know how, how, more clear I can be, so. |
| Slocum | Yeah. We, I mean, they are here for this event, the event is at capacity, sorry, everybody else is being asked to leave. |
| A.S. | Yeah. I will come and I will have one of my guys bring a trespass order… |
| Slocum | Ok. |
| A.S. | And I'll need you to sign it, okay? |
| Slocum | Ok. Today still? |
| A.S. | I'm sorry? |
| Slocum | Tonight? |
| A.S. | Oh, yeah. |
| Slocum | Ok. |
| A.S. | Yeah, yeah, yeah. And with that, do you want him trespassed from now on or just today? |
| Slocum | Just today. |
| A.S. | Ok. |
| Slocum | Just today. |
| A.S. | Alright. |
| Slocum | He just didn't follow the rules for the day. |
| A.S. | Easy peasy. |
| Slocum | Yep, thank you. |

52. Simmons walked away and later returned to the entry way where defendant Slocum was standing. After Simmons spoke with other Merriam police officers, he walks back over to Slocum and turns off his body worn camera – then turns it back on once he's outside the building walking by himself.

53. When defendant Slocum made her overcapacity statement to defendant Simmons, the Center's entryway, hallways, gym, offices, and fitness area was not overcapacity. The capacity of the three rented rooms which the ACLU conducted its town hall meeting was 517.

13

Slocum did not know how many people were in the three rooms at the time she had her interview with defendant Simmons when she made her statement of overcapacity.

54. Simply because the ACLU had rented three rooms from the City of Merrian at the Center on February 17, 2025, by doing so the City did not give authority to the ACLU to order individuals to leave the hallways of the Center, the fitness area, offices, or the entry way at the Center.

55. The ACLU did not have authority from the City of Merriam or Slocum to order Dr. Spiehs to leave the Center on February 17, 2025.

56. Slocum and Simmons should have known that the ACLU did not have authority to order Dr. Spiehs to leave the Center.

57. Slocum and Simmons actions included the intentional failure to investigate evidence which would exculpate Dr. Spiehs and making of false, misleading, and unreliable statements as well as the individual officers reports.

58. Slocum and Simmons should have known that no one from the ACLU told Dr. Spiehs he was ordered or otherwise had to leave the hallway in front of the meeting rooms or the Center.

59. Defendant Slocum had available to her security camera footage to ascertain that her statement about Dr. Spiehs entering the meeting room was false but chose not to view it.

60. Defendant Simmons had available to him security camera footage to ascertain Dr. Spiehs' conduct but chose not to do so.

61. After this conversation defendant Simmons walked to the other three officers. The four officers stood together for a few minutes talking about Dr. Spiehs. They eventually approached Dr. Spiehs who had been whispering in hush tones to his girlfriend explaining that he had done nothing wrong.

62. The town hall meeting continued without any interruption to a speaker's presentation.

63. Throughout the nearly 28 minutes of film time to this point Dr. Spiehs had been minimal, quiet, demure, and respectful.

64. Defendant Seargent Simmons then told Dr. Spiehs that "staff has requested that you be trespassed from the building" to which Dr. Spiehs asked "why?" Defendant Simmons said "because you are causing a ruckus."

65. When Dr. Spiehs was confronted by the defendant officer Seargent, he was told repeatedly that the Center was "a private business" and because of that the Center did not have to give a reason and had the right to trespass Dr. Spiehs. The defendant claimed that "you have to pay to come into this place."

66. Dr, Spiehs repeatedly told the defendant that the building was a public building and then asked what would happen to him if he didn't leave the building to which the defendant said "you will be arrested." Dr. Spiehs asked "what crime have I committed to be trespassed from

this building?" to which the defendant told him "if I tell you    you are trespassed as a representative of the building and you don't leave then it is criminal trespassing in the state of Kansas."

67. Defendant told Dr. Spiehs that "there is a protesting spot out on the sidewalk on the side of the building" – Dr. Spiehs said he was not protesting and Simmons said "you have a sign right there." Dr. Spiehs told him it was message and not a sign and that "you would be violating my First Amendment rights" to which the defendant said "no I won't."

68. Defendant said "are you willing to leave the business?" When Dr. Spiehs said "you will find yourself in a First Amendment lawsuit" defendant said "put your hands behind your back." This was at the 29:36 mark of Dr. Spiehs' video.

69. Dr. Spiehs was handcuffed behind his back and forced out of the hallway and the Center into one of the officer's vehicles.

70. When the reports were written up they contained false and incomplete information. The Offense Report falsely coded the "Premise" as "45" (a private business Gym) when in fact the correct coding was "16" – a Government/Tax Payer Funded Building."

### FIRST CAUSE OF ACTION
### (NOTICE AND OPPORTUNITY TO BE HEARD AND VAGUENESS)
### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AGAINST ALL DEFENDANTS
### (42 U.S.C. § 1983)

71. Plaintiff Dr. Justin Spiehs, repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Dr. Spiehs has been banned from the Center. Dr. Spiehs has not received any written trespass notice from the City nor has he received any procedure in which he can appeal that ban.

73. Government entities and officials, including the City of Merriam, cannot deprive an individual of a property or liberty interest without due process of law.

74. Procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

75. Dr. Spiehs has a strong First Amendment liberty interest to access to the Center's entry and hallways as a citizen and as a journalist during the hours the Center is open to the public particularly on February 17, 2025. Despite the ACLU's rental to use the Center rooms, the hallways in the Center remained a place for the public to assemble and discuss ideas and questions.

76. Nothing Dr. Spiehs did at the Center on February 17, 2025, interfered with or prevented the ACLU town hall message from being conveyed such that Dr. Spiehs sought inclusionary speech in the Center Hallway that infringed on another's rights.

77. In fact, the ACLU expressly advertised that its event was a town hall meeting open to all of the public. The Center remained a traditional public forum, notwithstanding the room rental agreement with the ACLU.

78. The claim by the ACLU representatives that the meeting area space was at capacity was false and a pretextual ruse to prevent Dr. Spiehs' news coverage and messaging during that town hall event. Neither the ACLU nor these defendants were entitled to a safe space free of Dr. Spiehs' reporting, presence, or his messaging in the Center on February 17, 2025.

79. Dr. Spiehs' verbal exclusion order provided no notice of why his presence in the Center on February 17, 2025, in the hallway while filming the hallway and entry to the meeting rooms other than the false claim that the Center was not a public building but a private business. The verbal exclusion order provided no appeals process.

80. As to part one of that inquiry, the Fourteenth Amendment to the United States Constitution protects the fundamental right to intra- and inter-state travel. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 164 (1972).

81. The freedom of movement is deeply engrained in our history and basic in our scheme of values. *Kent v. Dulles*, 357 U.S. 116, 126 (1958).

82. The right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution. *Chicago v. Morales,* 527 U.S. 41, 53-54 (1999).

83. Freedom of the Press and to observe is part of the liberty protected by the Due Process Clause of the Fourteenth Amendment.

84. Declaratory and injunctive relief preventing enforcement of any of the written or unwritten policies of the defendants is required to protect Dr. Spiehs rights under the Due Process Clause.

**SECOND CAUSE OF ACTION**
**WRONGFUL DETENTION**
**(42 U.S.C. § 1983)**
**(AGAINST DEFENDANTS SIMMONS, KISTHARDT, AND ALLEN)**

85. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

86. Dr. Spiehs was arrested on February 17, 2025, at the Center by the defendants Simmons, Kisthardt, and Allen.

87. There was no probable cause to arrest Dr. Spiehs because it was not reasonable to believe that the Center was a private business or that the Center was not a public building, or that the hallways of the Center were not a public forum.

88. There was no probable cause to believe Dr. Spiehs was "causing a ruckus" because the defendant officers personally witnessed Dr. Spiehs calm and demure behavior as well as the security camera footage was available to verify that Dr. Spiehs caused no disruption of the town hall meeting and did not cause any disorderly conduct in the hallway.

89. Plaintiff suffered damages as a result of the above actions.

### THIRD CAUSE OF ACTION
### RETALIATION, RETALIATORY ARREST, AND RETALIATORY DETENTION FOR EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (AGAINST DEFENDANT SLOCUM, SIMMONS, KISTHARDT, AND ALLEN)

90. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

91. Plaintiff Dr. Spiehs was  engaged in a constitutionally protected activity at the time of his arrest and detention. Defendants Slocum, Simmons, Kisthardt, and Allen's actions against the plaintiff would chill a person of ordinary firmness from continuing to engage in the protected activity; and his protected activity was a substantial or motivating factor in Slocum, Simmons, Kisthardt, and Allen's decision to arrest, detain, and remove Dr. Spiehs from the Center in handcuffs.

92. Defendant Simmons, Kisthardt, and Allen repeatedly retaliated against Dr. Spiehs for his presence, reporting, and messaging.  Dr. Spiehs wasn't breaching the peace or doing anything constituting disorderly conduct when Dr. Spiehs came on to the Center premises or when Simmons, Kisthardt, and Allen viewed Dr. Spiehs.

93. Each defendant was "motivated by improper considerations" such as "the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000).

94. Defendants Slocum, Simmons, Kisthardt, and Allen singled out Dr. Spiehs because he was reporting on the town hall and possessed messaging that made them and the town hall participants uncomfortable.  "Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else ... is unreasonable." *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022).

95. Each defendant further ratified those decisions by failing to meaningfully investigate and punish the unconstitutional conduct.

96. An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.  *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991).

97. Defendant City of Merriam had a policy or custom of viewpoint discrimination from the failure of the Police's Department or the defendant supervisors to take any remedial steps after the violation. *See Larez; Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

17

98. At the time of the arrest, Plaintiff Dr. Spiehs was engaged in constitutionally protected activity.

99.  Defendant Officers knew that Plaintiff's conduct did not violate Kansas state law.

100. Defendant Officers knew that Plaintiff's conduct was affirmatively protected by federal law.

101. The defendant Slocum, Simmons, Kisthardt, and Allen decision(s) to target Dr. Spiehs with trespass, then arrest, detain,  and initiate prosecution against the plaintiff came directly in response to and because of Plaintiff's reasonable exercise of his constitutionally protected rights under the First Amendment.

102. Defendant Slocum, Simmons, Kisthardt, and Allen sought to punish this Plaintiff for his news reporting, speech, and presence.  As a result, the plaintiff suffered physical injury, monetary damages in defending against the prosecution, emotional, other economic, and dignitary injuries.

103. Plaintiff has lost confidence in his ability to assert the rights guaranteed to him the Constitution of the United States of America. Plaintiff fears that each of these defendants will continue to retaliate/punish him for asserting his rights in the future.

104. Such actions by each of the defendant Slocum, Simmons, Kisthardt, and Allen, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other harms associated with retaliatory arrest.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. §1983 FOURTH AMENDMENT VIOLATION – UNLAWFUL ARREST/FAILURE-TO-INTERVENE**
**(AGAINST SIMMONS, KISTHARDT, AND ALLEN)**

105. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

106. It is not necessary that Simmons, Kisthardt, or Allen actually participate in the use of excessive force in arresting and handcuffing Dr. Spiehs in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.

107. Simmons, Kisthardt, and Allen claimed Dr. Spiehs was not on public property but instead on the property of a private business which justified Slocum's direction to trespass Dr. Spiehs.  But that each defendant should have known that the Center and its hallway is public property and a public forum such that Dr. Spiehs' presence and conduct cannot supply the probable cause necessary to initiate the arrest.  *See Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.3 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after").

108. The cited defendant post-arrest statements are *post hoc* decision-making which together indicate pretext.

109. Dr. Spiehs was present on a public area at the Center in the hallway.

110. Defendants knew that the plaintiff's specific conduct did not violate any Kansas or Federal law in lawfully observing or recording their activities.

111. Prior to the arrest, there was no crime committed by Dr. Spiehs, no emergency, nor did Dr. Spiehs threaten, or pose a threat, to any individual or defendant.

112. Defendants Slocum and Simmons, Kisthardt, and Allen failed to take reasonable steps to protect Dr. Spiehs from defendant Simmons, Kisthardt, and Allen's unlawful arrest and the unlawful use of excessive force.

113. The Chief of Police of Merriam has further justified these actions by not disciplining any of the defendants or in admitting fault.

114. Based on their training regarding First Amendment protections, the defendants each knew that simply because Dr. Spiehs being present at the Center reporting on the town hall meeting and presenting messaging was legal and did not give legal justification for Slocum to initiate trespass criminal proceedings or that any probable cause to arrest Dr. Spiehs existed.

115. It was only when Dr. Spiehs told defendant Simmons that "you will find yourself in a First Amendment lawsuit" did Simmons arrest Dr. Spiehs in retaliation, claiming pretextually that Dr. Spiehs did other things that justified his unlawful arrest.

116. At any time during the interaction with Plaintiff or the subsequent citation and detention process, Defendants Slocum, Simmons, Kisthardt, and Allen had the opportunity to intervene but failed to do so.

117. Instead of intervening to prevent the unlawful arrest of the plaintiff, all the individual defendants either chose to participate in the arrest the plaintiff or participate in that arrest without possessing any information that Dr. Spiehs had committed any crime.

118. The actions as described herein of Defendant Officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable search and seizure.

### FIFTH CAUSE OF ACTION
### EXCESSIVE FORCE
### (42 U.S.C. § 1983)
### (AGAINST SIMMONS, KISTHARDT, AND ALLEN)

119. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

19

120. Plaintiff makes alternative excessive force claims. Plaintiff posed no risk of harm to the defendant Officers.

121. Defendant Simmons, Kisthardt, and Allen lacked probable cause to approach, stop, or to arrest Dr. Spiehs. Any force used by defendants was excessive because the stop and arrest were unlawful and there was no basis for any threat or any use of force. *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022).

122. If a jury finds the arrest unconstitutional, the use of force and the search were unconstitutional. This becomes elements of damages for the § 1983 violation.

123. Alternatively, even if the arrest of Dr. Spiehs was supported by probable cause, the force used in effectuating the arrest remains excessive.

124. The force was not reasonably proportionate to the need for that force given the totality of the circumstances facing the defendant Officers prior to that force. There was no physical aggression or resistance shown by Dr. Spiehs prior to the use of force.

125. Prior to the excessive use of force, the plaintiff Dr. Spiehs posed no risk of harm to Defendants Slocum or Simmons, Kisthardt, and Allen.

126. The use of force upon the plaintiff Dr. Spiehs was unjustified, constituted an unreasonable and excessive use of force, and demonstrated deliberate indifference to his constitutional civil rights.

127. There was gratuitous use of force by defendants Simmons, Kisthardt, and Allen because Dr. Spiehs was compliant when he was told he was under arrest and did not resist the arrest, was compliant.

128. All of the named Officers in this Complaint, while acting under color of law as authorized officers and agents of the Police's Department of Merriam, Kansas, caused a constitutional deprivation of the rights of this plaintiff under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

129. The actions alleged in this Complaint directly and proximately resulted in injury to the plaintiff.

130. As a direct result of the grossly negligent misconduct of each defendant as set out in this Complaint and associated deliberate indifference, this plaintiff was injured and is entitled to recover damages flowing from the deprivations of the plaintiff's constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.
131. Plaintiff is entitled to attorney's fees expended in this litigation pursuant to 42 U.S.C. Section 1988.

WHEREFORE, Plaintiff demands judgment and compensatory and punitive damages against each Defendant, and in addition demands attorney's fees and costs pursuant to 42 U.S.C. Sections 1983 and 1988 and demands trial by jury on all issues so triable.

## SIXTH CAUSE OF ACTION
### MALICIOUS PROSECUTION AND ABUSE OF PROCESS UNDER 42 U.S.C. SECTION 1983
### (AGAINST DEFENDANT OFFICERS)

132. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

133. Plaintiff was charged with 21-5808.A.1.A under the Merriam Municipal Code, Case Number 2500510.

134. After arresting the plaintiff Dr. Spiehs, each of the defendant Officers caused a judicial proceeding to be commenced against Dr. Spiehs by the filing of reports and information in Merriam Kansas.

135. No reasonably cautious law enforcement officer in the position of the Defendant Officers would have believed that Dr. Spiehs could be arrested for standing quietly while filming in the hallway of the Center on February 17, 2025.

136. Said judicial proceeding was instituted by Defendants without probable cause as Dr. Spiehs did not commit a crime in the officers' presence or otherwise.

137. A reasonable inference from the lack of probable cause, combined with the AXON videos, photographic snapshots taken from those videos, the reports made by these defendants, and the statements made by these defendants preceding the arrest, during the arrest, and after the arrest, that each of the Officer defendants acted with malice when Dr. Spiehs was unlawfully arrested, and initiated the criminal prosecution by making false reports and charging Dr. Spiehs.

138. Defendant Allen reported that he "was dispatched to the Merriam Community Center in response to a keep the peace call involving overcrowding and frustration related to an ACLU event being held at the business." It was a false statement to characterize the Center as a "business."

139. Allen reported that he spoke with Anna Slocum who told him that a "male individual was inside the building holding a sign protesting the ACLU event." Allen reported that Slocum told him that the "individual had become agitated after ACLU event staff informed him that he was not permitted to enter the event, as the venue had reached maximum capacity."

140. Allen reported that a "member of the ACLU event staff approached us and expressed their concerns regarding the individual's presence. The staff member requested the male party leave the premises, reiterating that he was not allowed access to the event."

141. Allen falsely reported that when Allen encountered Dr. Spiehs that when he "attempted to engage him in conversation, but he would not allow me to speak."

142. Allen correctly reported that Dr. Spiehs informed defendant Simmons that the Center was a public building and that Dr. Spiehs had requested the grounds for the trespass.

21

143. In defendant Simmons report he stated that "Slocum confirmed that he needed to leave the building if he was not attending the meeting." In the report it is stated that Slocum was "willing to trespass the male from the community center." In the report it is stated that Slocum "was Okay with Spiehs protesting outside the building on the sidewalk that parallels Slater Street to the east of the building."

144. There is no notation in any of the reports as to the length of the trespass notice and nothing is noted regarding providing Dr. Spiehs any appeal rights to the ban from the property.

145. The actions as described herein of these defendant officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from wrongful prosecution as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other injuries associated with malicious prosecution.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO TRAIN AND**
**SUPERVISE UNDER 42 U.S.C. SECTION 1983**
**AGAINST DEFENDANT CITY OF MERRIAM**

146. The plaintiff hereby realleges and incorporates by reference the allegations contained above.

147. All conditions precedent to filing this action have been met by the plaintiff or have been waived by the City of Merriam.

148. The City has failed to train each of the defendants the difference between a private business and a public building, or as to First Amendment rights of individuals at the Center during occasions such as occurred on February 17, 2025. The City has failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Dr. Spiehs and of the public.

149. On February 17, 2025, the individual defendants were acting within the course and scope of their employment.

150. The named Officers in this Complaint breached the duties owed to this plaintiff when they each failed to adhere to accepted law enforcement standards and practices for detaining and arresting subjects.

151. The Police's Department failed to properly train and supervise its officers as to its Policy on probable cause for arrest, protected speech, and the differing standards applicable to trespass upon private property versus that upon public property constituting a public forum

152. The Police's Department failed to properly train and supervise its officers as to its Policy on alternative non-violent tactics to decrease the intensity of a situation, improve decision-

making, improve communication, reduce the need for force, and increase voluntary compliance.

153. The Police's Department has ratified and approved the actions of each of the defendants as the City of Merriam continue defending and justifying all of that conduct in Dr. Spiehs's criminal proceeding.

154. In light of the duties and responsibilities of those police officers that participate in arrests, preparation of police reports, and subsequent investigations of alleged crimes, the need for additional training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

155. The deliberately indifferent and/or non-existent training and supervision provided by the Police resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Police and were moving forces in the constitutional and federal violation injuries suffered by Dr. Spiehs.

156. The Police also failed to train its employees concerning Brady obligations. This law enforcement agencies should have adopted written procedures or policies to insure compliance with Brady.

157. Brady compliance was not taught by the Police and defendant Simmons did not complete any mandated curriculum regarding Brady compliance.

158. Defendant Police failed to adequately train and supervise the defendants Slocum and Simmons, Kisthardt, and Allen employed by the Police with respect to fundamental investigative techniques and duties, including the duty to know what a public building is, what constitutes a public forum, the duty to view security video footage rather than take Slocum's statements which, according to the reports, Slocum had no personal knowledge about Dr. Spiehs, disclose material exculpatory.

159. Because of the training failures Dr. Spiehs has been damaged as a proximate result of the defendant City policies and customs to employ police officers who were inadequately trained and supervised with respect to fundamental investigative techniques and their duty to disclose all material exculpatory and impeachment evidence.

160. Defendant City failed adequately to train and supervise Defendants Slocum, Simmons, Kisthardt, and Allen who were employed by the City, with deliberate indifference to the known and obvious consequences that deprivations of due process would result.

**EIGHTH CAUSE OF ACTION**
**EQUAL PROTECTION**
**FOURTEENTH AMENDMENT**
**AGAINST ALL DEFENDANTS**

161. The plaintiff hereby realleges and incorporates by reference the allegations contained above.

23

162. Dr. Spiehs brings a class of one equal protection claim.  Dr. Spiehs has been treated differently than other similarly situated and there is no rational basis for the difference in treatment as follows:

a.  Dr. Spiehs had a clearly established right to enter and remain in the Center's hallway which was a designated public forum.

b.  Dr. Spiehs had a clearly established right to enter and remain in the Center's hallway with whatever messaging he made on February 17, 2025, which was protected speech. Dr. Spiehs' presence did not endanger anyone and his speech was protected.

c.  Dr. Spiehs had a clearly established right not to be unlawfully detained, arrested, and removed from the Center because the three meeting rooms were over capacity.  Dr. Spiehs never entered the town hall meeting and was never permitted to do so by the ACLU or the defendants.

d.  Numerous individuals, including the media, entered the Center on February 17, 2025, carrying cameras or other devices such as phones that were capable of taking video or photos of the Center and individuals within the Center.

e.  Dr. Spiehs is a citizen journalist who went to the Center on February 17, 2025, to report on the town hall meeting and also to report and record individual's reactions to his presence and his messaging.  Other individuals associated with media entered the Center on February 17, 2025, at the time Dr. Spiehs did.

f.  A reporter for the Johnson County Post Juliana Garcia entered the Center and was not arrested or trespassed by the defendant Slocum.  Garcia took photos of individuals and was not trespassed or arrested.  Garcia took several photos of the meeting, individuals, and the meeting rooms such as those depicted below:



g.  Ms. Garcia reported that the "town hall on Monday afternoon drew an estimated 320 people to the Merriam Community Center. Dozens more were turned away because the space had reached its maximum capacity."  Garcia was not trespassed or arrested.

24

h.  The three rooms and the individuals who entered the Center and were not trespassed or arrested are depicted below:



The ACLU of Kansas town hall at the Merriam Community Center drew a packed house on Feb. 17. Photo credit Juliana Garcia.

i.  Micah Kubic, Emily Wales, and Karla Juarez entered the same Center on February 17, 2025, walked down the same hallway as Dr. Spiehs and spoke at the meeting. Neither Ms. Wales, Ms. Kubic, nor Ms. Juarez were trespassed or arrested.

j.  Dr. Spiehs also sought to attend the meeting to obtain information about the perspectives of the town hall speakers and organizers.

k.  Dr. Spiehs also sought to attend the meeting to convey one or more messages.

l.  Numerous individuals entered the Center on February 17, 2025, having messages displayed through various means.

m.  For example, some displayed a message of public concern simply by attending the town hall meeting.

n.  Others displayed various messages on their shirts, shoes, coats, hats, or materials that they each carried on February 17, 2025, into the Center and then into the town hall meeting rooms.

o.   There were numerous individuals who attempted to attend, asked questions, and were denied entry like Dr. Spiehs was. Defendant Slocum knew this when she decided to trespass Dr. Spiehs.  These individuals were denied entry for the same stated reason that the meeting room was over capacity. Similar to these individuals, they remained in the hallways or the Center and did not exit the building.

p.   Dr. Spiehs looked like and acted like all of the other individuals allowed to attend the town hall meeting as well as those who were denied entry into that meeting.  All of these individuals were similarly situated to Dr. Spiehs in all material respects.

163. There is no rationale but discrimination as to how or why defendant Slocum treated one individual who entered the Center on February 17, 2025, and was not admitted to the meeting but trespassed and arrested such as Dr. Spiehs and Slocum's treatment of similar individuals who did and said the same things yet were not trespassed or arrested.

164. There was no rational basis for the differing treatment of Dr. Spiehs from other individuals who entered the Center, walked or stood in the hallway, or who attempted to enter but were denied entry because of the overcapacity reason..

WHEREFORE as a proximate and direct result of the negligence of the City,  Plaintiff suffered severe mental and emotional distress arising from fear of incarceration and the humiliation, shame, embarrassment, and disgrace from detention, interrogation, arrest, bodily injury resulting in physical pain and suffering, pain and suffering, loss of the capacity for the enjoyment of life and are likely to continue into the future.

### PRAYERS FOR RELIEF

165. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to associate, and free speech in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.  Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

166. That as a direct and proximate result of the aforementioned unlawful conduct and omissions of each of the defendants, Plaintiff suffered fear, pain, anguish, and the following damages: a. shock, fright, anxiety, mental distress, annoyance, vexation, and humiliation suffered by plaintiff; b. loss of freedom; c. pain and suffering during the arrest and confinement; d. isolation from friends and family; e. loss of dignity; f. loss of reputation; g. Loss of enjoyment of life; h. Compensatory and punitive damages; and any and all other damages otherwise recoverable under USC Section 1983 and Section 1988; and punitive damages in the individual capacity of each Defendant.

167. Dr. Spiehs's First and Fourth Amendment rights were callously violated by each defendant sued in their individual capacity.

168. Dr. Spiehs's First and Fourth Amendment rights were maliciously violated by each defendant sued in their individual capacity.

169. Dr. Spiehs's First and Fourth Amendment rights were wantonly violated by each defendant sued in their individual capacity.

170. Dr. Spiehs's First and Fourth Amendment rights were oppressively violated by each defendant sued in their individual capacity.

171. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Dr. Spiehs individually, or toward persons in one of more groups or categories of which Dr. Spiehs is a member.

172. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one of more persons, including Dr. Spiehs.

173. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Dr. Spiehs with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Dr. Spiehs.

WHEREFORE, the plaintiff Dr. Justin Spiehs respectfully requests that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, punitive damages against the individual Defendants, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees, as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.
.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:            913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff